IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ARTURO MORALES RODRIGUEZ,       )
                                )
        Petitioner,             )
                                )       NO. 3:19-cv-00872
v.                              )       JUDGE RICHARDSON
                                )
SILVIA PAOLA LUJAN FERNANDEZ,   )
                                )
        Respondent.             )

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Respondent Silvia Paola Lujan Fernandez and her minor child, "AM," moved from their

home in Delicias, Mexico to the United States in the fall of 2018. The child's father, Petitioner

Arturo Morales Rodriguez, subsequently filed a petition under the Hague Convention on the Civil

Aspect of International Child Abduction ("Hague Convention"), seeking the return of AM (Doc.

No. 1, the "Petition"). On August 5, 2020, the Court held a one-day bench trial on the Petition.

At the conclusion of trial on August 5, 2020, the parties were instructed to file proposed

findings of fact and conclusions of law. Specifically, the undersigned instructed the parties to each

elucidate exactly what (in his or her opinion) the evidence submitted at trial showed and what

needs to be found in order for the Court to rule in his or her favor. Each party filed proposed

findings of fact and conclusions of law on August 19, 2020; responses thereto were filed

respectively by each party on August 26, 2020.[1]

---

[1] The parties were the ones to suggest the deadline of August 19. Thereafter, Petitioner requested
an extension of the deadline for such filings, on the grounds that he needed a trial transcript to be
prepared in order to effectively draft the proposed findings of fact and conclusions of law. (Doc.
No. 38). The Court declined the parties' request to extend the deadline. (Doc. No. 39). The Court
did so largely (but, as indicated below, by no means entirely) because neither party had previously

Having reviewed the record, the exhibits received in evidence, and the testimony of the witnesses, and after considering the witnesses' interests and demeanor, the Court enters the following Findings of Fact and Conclusions of Law. To the extent that the Court makes a particular finding, any testimony or other evidence inconsistent with that finding has been rejected by the Court, whether or not such inconsistent testimony or evidence (and the reasons for rejecting it) is specifically discussed herein. Further, the Court omits from its discussion facts that it deems immaterial to the issues presented.

## BACKGROUND[2]

Silvia Paola Lujan Fernandez ("Respondent") and Arturo Morales Rodriguez ("Petitioner") were never married, but they were involved in a romantic relationship which resulted in the birth of their child, AM ("the Child"), who was born in El Paso, Texas, in 2015. Shortly after AM was born, Petitioner, Respondent, and AM returned to their home in Chihuahua, Mexico, where they lived together until Petitioner and Respondent separated (for the first but not last time) in approximately May 2017.

---

indicated any need for a transcript, let alone indicated that their suggested deadline was contingent on a transcript being completed by any particular time. A fair amount of time has elapsed since the parties' last filings, and so counsel understandably might wonder whether the Court made them "hurry up and wait" for no good reason. The Court wishes to assure counsel that this is not the case. The Court also had particular timing and staffing issues that made it very desirable—for its docket as a whole but also for the most efficient and quickest preparation of these findings of fact and conclusions of law—for the Court to stick to the original briefing schedule. The Court likewise wishes to assure the parties that it does not see how counsel's access would have made any difference to the result here, which turned not on details that could be discerned only from the review of a transcript but rather on broad realities regarding who had what burden(s) and what was done to meet such burden(s).

[2] Unless stated otherwise, the facts set forth in this section are uncontested. The facts to a large extent represent the Court's summarizing, in substance and in part, pertinent testimony.

When Petitioner and Respondent separated, AM primarily lived with Respondent, but Petitioner and Respondent shared custody of AM. Respondent and Petitioner attempted to reunite in the fall of 2018. At that time, Petitioner suggested that the three of them move to Nashville, Tennessee,[3] where Respondent's mother resides, to give themselves a "fresh start." Petitioner proposed that they move specifically in December 2018 because the high season for Petitioner's business (buying and selling pecans) is the fall. Respondent agreed with Petitioner's plan to move to Nashville but expressed the desire that she and AM go earlier so that they could spend time with her mother, whom she did not see often. The two agreed that Respondent and AM would travel to Nashville in October 2018 and that Petitioner would meet them in December 2018.

Before Respondent and Petitioner left Delicias, Mexico, they had a baptism for AM at their church. AM's school threw a going-away party for him. Friends threw going-away parties, as well. On October 1, 2018, Petitioner and Petitioner's parents drove Respondent and AM to the airport in Mexico, and Respondent and AM flew to Nashville. Shortly thereafter, Respondent told Petitioner that she no longer wanted to be in a relationship with him.[4]

---

[3] At no point did either party refer to actually or potentially living anywhere else in the United States or outside Mexico. Therefore, any reference herein to actually or potentially living in the "United States" should be taken also as a reference to living in Nashville (or Tennessee), and any reference to potentially not living in Nashville or Tennessee should be taken as a reference to not living in the United States (and indeed not living outside Mexico at all).

[4] It is unclear exactly how many days after Respondent arrived in Nashville passed before she told Petitioner on a phone call that she no longer wanted to reunite with him; Petitioner claimed on direct examination that it was approximately two weeks and claimed on cross-examination that it was October 17 or 18, whichever was the Thursday (which in fact would have been October 18). The Court will therefore refer to this phone call as having occurred on October 18, though the parties refer to the phone call as having occurred on either date (October 17 or October 18). Petitioner's selected date of wrongful retention, October 17, seems to have been premised on this phone call occurring on October 17 instead of October 18. Though the Court recognizes this discrepancy between Petitioner's view of the date of the phone call (October 18) and Petitioner's view of the date of the alleged wrongful retention (October 17), the Court will continue to refer to

In December 2018, Respondent and AM traveled back to Delicias, Mexico, where they remained for a few weeks to celebrate the holidays. Respondent and AM then traveled back to Nashville. Respondent told Petitioner she had to return in order to complete car payments and take care of other responsibilities.

In February 2019, according to Petitioner, he purchased plane tickets for Respondent and AM to visit Delicias again in March so that he could see his son.[5] Respondent and AM stayed two weeks. Petitioner testified that—now believing that Respondent was never coming back to live in Delicias—he formed a plan with an attorney to provide Respondent with notification that she could not go outside Mexico with AM absent a custody agreement.[6]

On March 31, 2019, Respondent sent Petitioner a text message stating that she did not want to live in Delicias. In April 2019, Petitioner visited Respondent in Nashville. While there, Petitioner left letters for Respondent and Respondent's mother protesting AM's presence in the United States. In June 2019, Petitioner filed an application with the Mexican Secretary of Exterior Relations (essentially the head of Mexico's foreign ministry, whose American counterpart is the State Department) wherein he requested the return of AM to Mexico.

_____

Petitioner's selected date of wrongful retention as October 17 for clarity, as this is how Petitioner repeatedly framed it in his post-trial filings.

Additionally, it is unclear exactly what Respondent told Petitioner at this time. Petitioner claims that Respondent told him not to come. Respondent claims that she told him he could come in order to be near AM, but that he should get a separate apartment and that they would not be in an intimate relationship.

[5] Though the trip was in March, the tickets indicate they were purchased in February. (Respondent's Exhibit ("Def. Ex.") 8).

[6] This—and Petitioner's below-referenced testimony that it dawned on him in February that Respondent was not going to return to Delicias to live—suggest that Petitioner formed this plan while Respondent was still in Mexico, during her March visit, but the record is not entirely clear on that point.

## PROCEDURAL BACKGROUND

On October 1, 2019, Petitioner filed the pending Petition under the Hague Convention, asserting that Respondent wrongfully removed AM from Mexico and seeking AM's prompt return. After delays occasioned largely by COVID-19, the Court held a bench trial on August 5, 2020. Prior to trial, the parties stipulated to the following facts: (1) prior to October 1, 2018, AM's habitual residence was Delicias, Mexico, (2) both Respondent and Petitioner had custody rights to AM pursuant to Mexico's Civil Code, and (3) Respondent and Petitioner were both actually exercising their custody rights. (Doc. No. 19 at 2-3).[7] The parties also stipulated to the admissibility of some of the parties' exhibits, including all of Petitioner's exhibits except numbers 4, 5, and 6 and then all of the Respondent's exhibits except numbers 4 and 10.[8]

At the end of trial, Respondent withdrew her affirmative defense under Hague Convention Section 13(a) whereby she would have the burden of proof by a preponderance to show Petitioner's consent or acquiescence.

## EVIDENCE PRESENTED AT TRIAL[9]

### I. Petitioner's Evidence

---

[7] As these points did not appear to be in legitimate dispute, they were tailor-made topics for stipulation, thus enabling the parties more court time and attention to focus on what was truly at issue in this case. Counsel, especially Petitioner's counsel, is to be commended for reaching these stipulations and thus promoting litigative and judicial efficiency.

[8] The parties and counsel are to be commended also for entering into these stipulations, which inure to the benefit of each party and the Court alike by enabling the Court to focus its attention on the issues that each party thinks are both material and in dispute.

[9] In this section, the Court reviews, in somewhat more detail, some of the testimony paraphrased above in its recounting of the undisputed (or essentially undisputable) factual background. But the Court here also paraphrases in substance and in part other testimony, some but not all of which is disputed by the party that did not call the witness. When helpful in the Court's view, the Court will note what testimony was provided at what phase of witness examination (direct, cross, etc.).

### a. Testimony of Petitioner

Petitioner Arturo Morales Rodriguez testified that he was born in and resides in Chihuahua, Mexico,[10] and owns a business buying and selling pecans. According to Petitioner, he met Respondent in 2010. Petitioner, Respondent, and AM lived together in Delicias, in Chihuahua, Mexico; the three resided together for about three years until Petitioner and Respondent's relationship deteriorated in May 2017.[11] Thereafter, according to Petitioner, he moved into his parents' house while AM lived with Respondent in the house Petitioner and Respondent had rented. Petitioner testified that after the relationship ended in 2017, he and Respondent shared custody of AM.

Petitioner described AM's life before Respondent and AM moved to the United States. Specifically, Petitioner testified that most of AM's family resides in Delicias, and Petitioner's mother would take care of AM while Respondent studied and Petitioner worked. Petitioner further testified that he, Respondent, and AM regularly attended family gatherings and parties, and they celebrated birthdays with AM's extended family. (Pl. Ex. 15). According to Petitioner, AM was enrolled in a daycare since he was three years-old, and he was in kindergarten just prior to his move to the United States. (Pl. Ex. 20). Petitioner testified that he would play baseball and basketball with AM, they went together to the movies and to church, and they would play together in the backyard of Petitioner's father's home. According to Petitioner, he shared responsibility for taking care of AM, including providing food and care, making medical decisions, and providing discipline.

---

[10] In his filing to the Secretary of Exterior Relations, Petitioner lists his citizenship as Mexican. (Plaintiff's Exhibit ("Pl. Ex.") Ex. 1).

[11] Though the relationship deteriorated at this time, prompting Petitioner to move out, Petitioner also testified that he and Respondent reconciled several times after this date.

Petitioner testified that during the fall of 2018, he and Respondent attempted to mend their relationship. According to Petitioner, they went to therapy, and they cohabitated from time to time. At some point during their attempts to reunite, Petitioner suggested that the three of them move somewhere and start their lives over. Petitioner testified that he came up with an idea to move to Nashville, Tennessee because Respondent's mother was living there, and Petitioner had previously lived in Nashville for about four months; he therefore proposed that in December 2018 (after the pecan high season) they use his business earnings to move to Nashville. Respondent told Petitioner that she wanted to go early so that she could spend some time with her mother and so that Petitioner could focus on his job. Petitioner agreed that he would meet Respondent and AM in December 2018.

According to Petitioner, his understanding from the beginning was that Respondent would live in Tennessee with AM (and with him beginning in December) not permanently, but only for several months because he had permission to live there six months maximum.[12] And as for Respondent and AM living permanently in the United States without him, he "of course" never agreed to that.

On cross-examination, Petitioner testified that in anticipation of their move, he and Respondent held a baptism for AM in Delicias. AM's school threw a going-away party for him. He assisted Respondent in selling her car. On October 1, 2018, Petitioner and his parents drove Respondent and AM to the airport.

---

[12] Petitioner provided this clarification in response to brief questioning at the conclusion of his testimony provided on his case-in-chief. In referring to a maximum permissible term of residence of six months, the Court presumes Petitioner was referring to the maximum term authorized for a visa under U.S. immigration law.

Approximately two weeks after Respondent and AM arrived in the United States, Petitioner told Respondent that he planned to get a new car and apartment in Nashville where they all could live together when he joined them that December. According to Petitioner, Respondent said that he should not be making plans, because she had decided that she did not want to reunite with him; as noted above, according to Petitioner, this call ("October 18 call") occurred on October 18. Notably, Petitioner testified that Respondent told him that he should not move to Nashville with them.

Petitioner testified that he was much saddened by Respondent's decision conveyed in the October 18 call. Petitioner also gave an account, across several phases of witness examination, on the crucial topic of how he responded to that decision. On direct examination, Petitioner testified that he told Respondent—perhaps during the October 18 call itself, though this is unclear—that this was not okay and that if this had been her idea (meaning, apparently, to live in Tennessee without him), she should have told him that while they were still in Delicias. According to Petitioner, he got mad and stopping talking to Respondent about this, but also tried to stay calm and figure out how to works things out with Respondent when she returned to Delicias in December.

On cross examination, when asked how soon after the October 18 call he demanded of Respondent that she return AM to Mexico, Petitioner responded that it was three or four days thereafter (because he was angry) and added that he "decided to go with that plan until December and she will go back to Delicias[.]" Petitioner accordingly was asked whether his next decision after the October 18 call was to just wait until Respondent came back to Delicias in December, and he responded yes and added that he realized that Respondent needed time alone with her

mother, that he decided to give her that time so that she could "process over our separation," and that this was okay with him.

On redirect, Petitioner testified that in October 2018, after the October 18 call, he took no legal actions but spoke with Respondent about the situation and told her "that that wasn't in the plan,"[13] and Respondent said that she would return to Delicias in December. Petitioner then was asked whether, from the time Respondent left in October (2018) until February (2019), he had communications with Respondent objecting to her living with AM in the United States without him. Petitioner responded with an answer that, as set forth below, hurts his case; he answered the question with an unqualified no, then explained that he had made no such objection because Respondent had not told him that it was her plan to live in the United States (by which he presumably meant live *permanently* in the United States).

Petitioner did testify multiple times that he repeatedly and continually objected to AM being in the United States. But as noted above, he also admitted that he did not begin objecting until February 2019 and that most of his objections took place in February.[14]

Petitioner testified that after Respondent and AM moved to the United States, he remained involved in AM's life. He had regular phone calls with AM two or three times a week. He tried to discipline him and to stay involved in major decisions that affected AM's life.

Petitioner also testified about his advance understanding regarding Respondent's upcoming December 2018 visit. On direct examination, he testified that Respondent came back to

---

[13] The meaning of the second "that" in Petitioner's testimony is unclear, and it is therefore unclear what exactly Petitioner was referencing as not being in the plan.

[14] During cross examination, Petitioner did not explain why he did not present text messages from the fall of 2018, stating that many of his objections had been via telephone call. In briefing, counsel for Petitioner stated that Petitioner lost his phone. (Doc. 40 at 14).

Delicias in December for the holidays because AM was not in school in Nashville; prior to the visit, Respondent told Petitioner that she had to return to Nashville after their trip because she had obligations there, including making payments for the truck she had purchased in Nashville. On cross-examination, Petitioner testified that he had booked for her and AM a round-trip ticket from and back to Nashville and that Respondent told him over the phone that she would come back to Delicias in December and that they could discuss AM's life at that time.

Petitioner testified that Respondent and AM returned to Delicias in December 2018 for the holidays, as planned. According to Petitioner, Respondent and AM stayed (only) two weeks before returning to Nashville, and he was "okay with that." During the visit, according to Petitioner, they discussed that she would return to Nashville for two or three months and then come back to Delicias, but they never discussed custody or Respondent attempting to build a life in Nashville.

By the end of his testimony, Petitioner's position on each of two points was clear: at least through the end of the December visit, (1) Respondent never indicated that she intended to live in Tennessee permanently; and (2) he never understood that she intended to live in Tennessee permanently. In partial support of the reasonableness of his understanding in this regard, Petitioner testified to his belief that Respondent was not working (at a job or profession) and that AM was not enrolled in school in Tennessee.[15]

Additionally, Petitioner testified that because Respondent never mentioned that she intended to live (with) AM in Tennessee permanently, Petitioner did not file legal proceedings throughout this time period.

---

[15] On re-cross examination, Petitioner testified that Respondent had told him that she was working for pay (for Respondent's mother). And Petitioner would later testify, when called as a witness by Respondent, that he did know that Respondent was working for pay (for Respondent's mother) and that AM was in school during the fall of 2018, as early as October.

Petitioner offered as exhibits during trial several text messages between himself and Respondent from February 2019, which he contends demonstrate that he did not consent to AM's presence in the United States. The exhibits were provided to the Court in Spanish, but Petitioner translated and read them into the record during trial.

First, on February 4, 2019, Petitioner sent Respondent a text message that, per a close paraphrasing of Petitioner's translation, read along the following lines:

> I will never understand why you without asking me not at all, you're taking all the decisions regarding our son have him there without asking me anything. I am [AM's] dad. I love him and I will never have wished to stay away from him.

(Pl. Ex. 7). Petitioner testified on direct examination that he sent this message because he had started to realize that Respondent did not intend to return to Delicias, when she refused to answer a question about when she would return.[16] Then, on February 5, 2019, Petitioner sent Respondent the following text message that read, per a close paraphrasing of Petitioner's translation, read along the following lines:

> I'm asking you to think about it very well what do you want to do. If you want to stay there . . . or coming back. If it is to stay there, that is bad but you have to talk about it with me and you have to be with my consent and my conditions about when I'm going to see our son. You have the obligations of taking the decisions of our son and him with me. You're not . . . only you. It's the only thing that I'm asking you to think about it and we talk about it.

(Pl. Ex. 8).

On February 9, 2019, Petitioner sent Respondent the following text message:

---

[16] Petitioner testified to both this text conversation and several other events as being the proverbial "moment" that he understood Respondent did not plan to return to Mexico. All of the times that he described understanding Respondent's intent not to return took place from February 2019 onward, and as noted below Petitioner testified that sometime in February was the first time he understood that Respondent did not plan to return.

I'm sorry but you're not taking any considerations of my part. I am his dad and you have taken him, cheated[17] absolutely. This has to stop.

(Pl. Ex. 9).

Petitioner testified that as of this juncture, he now believed Respondent had no intentions to get back together with him and that it was her intention to stay in the United States no matter what. When asked on direct examination when he understood that Respondent was never going to return to Mexico, Petitioner answered that it was February, when he was asking her about the date of her return, and she was not answering him. Petitioner testified that when he sent Respondent these messages, she replied by telling him that he knew where they were living and could come at any time. Petitioner also testified that Respondent would not talk about her intentions, but she stated that she and AM were not coming back to Delicias.

After he realized that Respondent was not going to move back to Delicias, Petitioner hired an attorney in Mexico. He and the attorney formulated a plan to notify Respondent (in some way left unspecified in the trial testimony), while she was in Mexico on the trip, that she could not leave Mexico until a custody agreement had been reached. Petitioner purchased plane tickets for Respondent and AM to visit Delicias in March 2019.[18]As far as the Court can tell, Petitioner did not serve Respondent with any kind of notification while she was in Mexico.[19] Respondent and AM returned to Nashville from Delicias in March without telling Petitioner. As Petitioner testified,

---

[17] Petitioner testified that by "cheated" he meant "tricked."

[18] Though the trip was in March, the tickets entered into evidence indicate they were purchased in February. (Def. Ex. 8). Petitioner did not testify to when specifically he hired an attorney, but it could have been before purchasing the tickets.

[19] During her testimony, Respondent testified that she had never been served with any type of paperwork about a court proceeding, but it is unclear whether this testimony (if accurate) entails that she never received whatever notification Petitioner and his attorney planned to give her.

on March 31, Respondent sent Petitioner a text message stating that she did not want to live in Delicias, Mexico: "You will understand that I don't want to be in Delicias. I have responsibilities here. My lawyer will communicate with you to try to do the same agreement that I always had wanted to do with you." (Pl. Ex. 11). Petitioner testified that it was after he received this text that he really realized that Respondent was not returning to Delicias and that she had not expressed a desire not to return before.

Notably, Petitioner testified that between December 2018 and February 2019, he told Respondent that if there was still a chance that they could get back together, things could be different.[20]

Petitioner visited Nashville in April 2019. Petitioner left two letters in Nashville: one for Respondent and one for Respondent's mother. The letters were entered into evidence. (Pl. Exs. 2, 3). The letter to Respondent stated, in relevant part:

> …It was not the right thing and what hurt me like Dad, is the fact that you not only cut with a plan that we had to live and try for a while to reconcile, but that apart from the break you left me without being able to enjoy our son AM for a long time, which I still cannot enjoy as I would like since you simply made your decision to live in the United States with our son, without my consent or prior notice, leaving me aside as Dad, also making AM not Enjoy valuable time with his dad, yes, with the video calls but well you know that that is not enough nor does it compare with the kisses and hugs that our son gives us and he needs and the time he needs to spend with his parents, you have I've seen his tears that he misses me and I've seen his tears that he misses you when he's with me alone without you.

Later in the letter, Petitioner wrote:

> Although it is your decision and you are sure that you want to make your life in the United States, as far as I am concerned, it is not yet time for AM to leave his place of residence that is Delicias, where he has lived his life, where he has the majority from his family and friends, where he has been in a good school and we take away a whole year of learning and fun to share with his classmates from the

---

[20] The exact timeline and terms of the proposed reunion with Respondent are unclear. Petitioner's testimony at several points indicates that he stopped believing they would reunite in February 2019.

school where he was, you know well how happy he was in that school and how happy he was is to be with your family and my family in Delicias, I want at least AM to have her kindergarden education in Delicias, learn a little English, enjoy the 2 of us more time together in the same city…I do not agree that AM is currently in the United States, not for selfishness or not wanting the best for him or for you, but because it is not the right time for a child his age that is separated so long from one of his parents, You said that you would never separate him from me…

In his letter to Respondent's mother, Petitioner stated that:

As for [Respondent's] decision to bring it to the United States, I never approved it, I never agreed and [Respondent] never discussed it with me, the plan was not for them to come to Nashville and settle down leaving me aside and outside of the decisions of AM, for you it may be that you made the right decision, for me and for my son It is not, because you are taking away my right to live with MY SON just as MY SON also takes away his need to be with me.

In June 2019, Petitioner filed an application with the Secretary of Exterior Affairs in Mexico. (Pl. Ex. 1). In the application, Petitioner claimed that Respondent and AM had traveled to Tennessee in October 2018 for "vacation" because Respondent's mother resides there. On cross-examination, Petitioner stood by this characterization, asserting essentially that calling it a "vacation" was appropriate because Respondent was not working and AM was not in school. In the application, Petitioner further claimed that Respondent returned with AM from Tennessee to Delicias on March 22, 2019, "since they were only going on vacation to the United States, due to the verbal consent on my part had already reached its deadline." But then, according to Petitioner in his application, Respondent made the decision to take AM to Tennessee "without notice [to], [and] without consent or approval [of]" of Petitioner, who learned of their departure only three days later.

In other words, Petitioner clearly implied here that nothing had been done wrongfully or against his wishes *until after March 22*, and that the problem was with AM's removal on *March 29*. This implication does not square at all easily with positions taken by Petitioner at other times. As noted above, in his testimony, he claimed to be aggrieved long prior to March 29. And as will

be noted below, his position during this litigation was: (1) first that Respondent's original removal of AM in October 2018 was wrongful, and (2) then, when that position proved untenable, that the removal was not wrongful but that AM's retention became wrongful at some point—in particular, in October 2018, and *absolutely not* at any later.

### b. *Testimony of Carlos Baca*

Carlos Baca was called by Petitioner and testified on direct examination, with Respondent declining any cross-examination. Baca testified that he has known Petitioner since they were children and met Respondent through his relationship with Petitioner. Baca testified that Respondent and Petitioner had a normal relationship before their split. After their split, Baca testified, they tried to reconcile several times, and as a friend of each of them, he would receive messages for advice from them. According to Baca, after the two were no longer romantically together, Respondent remained in what had been their joint residence, and Petitioner moved to another home. Both parents continued to share responsibility for AM, and some of the activities AM participated in included daycare, playground trips, barbeque parties, and movies.

In 2018, Petitioner informed Carlos Baca of the plan to move to the United States to better AM's life and his own relationship with Respondent. Petitioner told Carlos Baca that they wished to be close to Respondent's grandmother and that the agreement was that all three individuals, Petitioner, Respondent, and AM, would move together. Petitioner told Carlos Baca that he would stay to finish his work, while Respondent would go earlier to visit with her mother and prepare for living together.

Carlos Baca testified that Petitioner told him that Respondent told Petitioner that she did not want him to join her and AM in Tennessee. According to Baca, Petitioner said that Respondent had told him that earlier that same day (which would have been October 18, 2018, according to

Petitioner, as noted above). Further according to Baca, Petitioner was sad, angry, and afraid when he learned of Respondent's change of plans. Baca testified that he texted Respondent, who told him that she knew that Petitioner was upset and that Petitioner would be welcome to visit; Respondent told Baca that the reason she changed her mind was that she had now had some time to herself and thought that it would be better to live separately.

Baca testified that he knew of no agreement for Respondent to remain in Tennessee without Petitioner. He stated that Respondent became scared of a legal battle during her trip to Mexico in March and fled back to the United States early. According to Baca, he has remained in contact with both Respondent and Petitioner throughout these legal proceedings. Baca testified that Respondent (at some unspecified point, but perhaps the first time he spoke with her after the October 18 call) told him that what she did was wrong and that she had gone about things the wrong way. Baca testified that Petitioner never expressed that he was okay with his son staying in the United States without him. Baca stated that eventually, probably in October or November of 2019, Respondent changed her story and denied that she had agreed to have all three, including Petitioner, live together in the United States. According to Baca, he told her that she (Respondent) knew that this was a lie.

Baca testified that Petitioner stays in touch with AM and that Petitioner is involved in his son's activities, but that fights between Respondent and Petitioner cause gaps in communication.

II.     Respondent's Evidence

        a.   Testimony of Silvia Marguerita Tooley

Silvia Marguerita Tooley ("Tooley"), Respondent's mother, testified with the assistance of an interpreter. Tooley testified that Respondent moved from Delicias to Tennessee in late 2018. According to Tooley, prior to the move, she spoke with Respondent about this potential move; she

understood that it would be a permanent move, as Respondent never said it was for vacation and said instead that she (Respondent) was going to come live with her (Tooley). According to Tooley, the family made plans to move including unenrolling AM from school, selling a truck, saying good-bye to friends, and baptizing AM. Tooley testified that she picked AM and Respondent up from the airport in Nashville, and Respondent then started working at a store owned by Respondent's brother (Tooley's son). Tooley stated that her family in Nashville includes her son and his family and a cousin and her family who all do frequent activities together, such as vacations and going to the park.

On cross examination, Tooley agreed that the original plan was for Petitioner as well as Respondent to move to the United States to live with her. She then was asked whether Respondent changed her mind about this after being there for two weeks. In response, Tooley first answered that Respondent had changed her mind, but only two or three days after arrival. But then she stated that it was in "the first or second week"—while gratuitously and, frankly, suspiciously offering a fairly lame excuse for not "pay[ing] attention" to this. Next, having just claimed not to have paid enough attention to really recall such matters, she twice testified emphatically that it was exactly two weeks before Respondent told her that she (Respondent) was going to stay in Tooley's house and that Petitioner was going to come but not necessarily live with them.[21] Tooley offered no explanation for the sudden and impressive restoration of her memory. Her testimony on this topic is not at all credible, and the Court will disregard it completely.

_____

[21] Tooley testified remotely in the presence of Respondent, her daughter. Based on the Court's perception, Tooley's change in answer from two or three days to two weeks possibly resulted from coaching of her daughter from off camera. But the Court cannot say for sure. Needless to say, the Court would not approve of any such thing and attempted to prevent it, and the Court would condemn any such tactic in the strongest of terms.

### b. *Testimony of Respondent*

Respondent testified that she left Delicias on October 1, 2018, and went to Tennessee. She then testified to the backdrop for that move: she and Petitioner went to buy some things for AM's schooling and when they returned back to Delicias, Petitioner presented her with the idea of moving together to the United States. According to Respondent she told him she would think about it, and after a week or two of consideration, she told him yes.

Respondent testified that both she and AM are United States citizens. Respondent intended for the move to the United States to be permanent. Prior to the move, Respondent sold her car in Mexico, with the help of Petitioner, in order to be able purchase a new car in the United States. Respondent testified that there was a baptism for AM before leaving Delicias because they did not know when they would return. Petitioner was aware of and helped with the baptism. AM's school had a going-away party—as opposed to a going on vacation party—and Respondent unenrolled AM from school and told both the school and the teacher that they would be moving to the United States. Friends had additional going-away parties for AM and Respondent.

Respondent testified that prior to her and AM's trip back to Delicias in December she informed Petitioner that she had found a job (which she had found at the family tire shop) and childcare for AM (a day care, as kindergarten was not an option). Respondent booked a round-trip ticket for the trip to Mexico in December; at that time, she considered Tennessee to be her home, as she had since moving to Tennessee in 2018.

In her testimony, Respondent denied lying or misrepresenting her intentions to Petitioner when they moved to Tennessee. Respondent testified that she originally meant to sincerely try to give an effort to the plan to live together, but she subsequently changed her mind. According to Respondent, she told Petitioner she no longer wanted to be with him, but she did not tell him so

until sometime after October 4. Respondent testified that she offered for Petitioner to come to Tennessee and did not discourage him from doing so. Respondent also testified that in December and January, Petitioner continued to try to reconcile with her, and they discussed living together at her mother's house or in East Nashville.

According to Respondent, when she told Petitioner that she no longer wished to be together, Petitioner was mad and stated he wanted to be with AM; however; he did not tell her to come back to Mexico or say he did not want her or AM in the United States. Respondent testified that she believed that Petitioner's focus was on being with AM in the United States, as opposed to having AM returned to Mexico. Petitioner mentioned to Respondent the possibility of moving to the United States, renting a room, and working so that he could see AM. Respondent said that AM had always lived with her, and so Petitioner did not have any input in the decision. Respondent stated that she never received a direct request to return AM, she never intended to keep AM away from Petitioner, she sent Petitioner pictures, and she invited Petitioner to relocate.

On cross-examination, Respondent was asked to concede that prior to her leaving Delicias, Petitioner never agreed for her to live in the United States with AM but without Petitioner. Respondent effectively conceded the point, but explained essentially that this topic naturally did not come up for the simple reason that their plan at that time was to be together. On cross-examination, Respondent also testified that although her plan to live with Petitioner had changed, she did not try to keep Petitioner from coming to live in Tennessee near AM; she also stressed that Petitioner did not demand that AM not live in the United States, but instead merely stated that he wanted not to be away from AM. Petitioner also admitted on cross-examination that she would be the one to decide, unilaterally, where AM would live.

### c. *Rebuttal Testimony of Arturo Morales*

During rebuttal testimony, Petitioner admitted to knowing that Respondent was working in the United States as of October 16, 2018, as shown in a text conversation between the two. Another text conversation, on October 23, 2018, showed that Petitioner knew that AM was in school. In the text exchange, Respondent also communicated the name of the childcare facility AM attended and explained to Petitioner differences between United States and Mexican educational systems.[22]

## **FINDINGS OF FACT**

Weighing the evidence to ascertain what actually occurred in this case has been difficult, due to the inconsistencies between Petitioner's varying claims of what happened and the inconsistencies between Respondent and Petitioner's recollections of events and conversations surrounding the Respondent's move with AM to the United States. The Court's ability to resolve the factual disputes was hampered by language barriers, with none of the witnesses being native English speakers and many of the exhibits necessitating translation from Spanish to English. These linguistic difficulties were magnified by the fact that the witnesses testified remotely, with suboptimal reception and technology issues. The Court, nonetheless, was able to see and hear the demeanor and presentation of the Respondent, Petitioner, and the other witnesses. Respondent and Petitioner's stories were not entirely consistent, and the Court ultimately cannot find either party fully credible or persuasive. The Court does not find that either party fabricated evidence or knowingly testified materially falsely, but the Court remains unsatisfied that either party should

---

[22] Petitioner had previously testified that he did not believe AM to be in school or Respondent to be working, and that this is what made him characterize their trip to the United States as a "vacation."

be fully believed regarding their account of events. Piecing together the elements of evidence and testimony that can be fitted together, the Court finds as follows:

Petitioner, Mexican citizen Arturo Morales Rodriguez, and Respondent, American citizen Silvia Paola Lujan Fernandez, have a son, AM, who was born in El Paso, Texas, in 2015 and is an American citizen. Prior to October 1, 2018, AM's habitual residence was Delicias, Mexico.[23] During this time, both Petitioner and Respondent had custody rights to AM pursuant to Mexico's Civil Code, and Petitioner and Respondent were both actually exercising their custody rights. (Doc. No. 19 at 2-3).

Petitioner and Respondent never married, and they have had an on-again-off-again relationship since AM was born. When not romantically together and living in Delicias, they stayed in separate homes nearby one another so that both parents could remain involved in AM's life, though AM primarily lived with Respondent. In the fall of 2018, the parties decided to move to Tennessee in order to better their own relationship and to live as a family unit with their son. Petitioner's busy season at work prevented him from joining Respondent and AM when they initially travelled to the United States, but Respondent and AM decided to go ahead without him in order to spend time with Respondent's mother. The agreement at that time was that Petitioner would travel to America after his busy season to live as a family unit with Respondent and AM.

Before leaving Mexico, Respondent and Petitioner had a baptism for AM, and AM's school and family friends threw going-away parties. Petitioner assisted Respondent in selling her car in Mexico and transferred the money from the sale to her. On October 1, 2018, Petitioner drove

---

[23] This fact was stipulated to by the parties, but there is also ample evidence in the record of Delicias being AM's habitual residence before October 1, 2018, including his enrollment in school, his friendships with classmates, his family connections, his involvement in celebrations and parties, his extracurricular activities, and his relationship with both parents who were living there.

Respondent and AM to the airport, from where they traveled to Tennessee. Within two weeks of being in the United States, Petitioner told Respondent that she was no longer interested in pursuing a co-habiting relationship with him.[24]

Petitioner and Respondent continued to discuss AM's life through the fall and winter of 2018. Petitioner did not immediately express clear disapproval of Respondent and AM residing in the United States at that time. Rather, he intended to discuss it with her when she returned to Delicias to visit in December 2018. Petitioner also believed up until approximately February 2019 that he and Respondent might be able to rekindle their relationship and live as a family unit in the United States.

In December 2018, Respondent and AM traveled back to Delicias, Mexico, to celebrate the holidays. The trip lasted approximately three weeks, from December 15, 2018, until January 5, 2019. (Def. Ex. 6). During this trip, Respondent told Petitioner she had to return to Tennessee in order to complete car payments and responsibilities there.

In February of 2019, Petitioner indicated his displeasure with the arrangement and became aware that Respondent was not planning to return to Mexico, as evidenced by several text conversations. Around this same time, Petitioner consulted with an attorney in Mexico and purchased plane tickets for Respondent and AM to return to Mexico with the plan of notifying Respondent not to leave Mexico until the custody was determined. The tickets were purchased on February 12, and the plan was for Respondent and AM to leave Nashville on March 22 and return

---

[24] It is unclear exactly how long after arriving in Nashville Respondent communicated this fact. As noted, the Court has concerns regarding the apparent coaching of Tooley to change her answer from a few days to two weeks. Regardless, the exact amount of days (whether two or fourteen) will not affect the Court's legal analysis, and a factual finding that Respondent informed Petitioner she no longer wished to be together within two weeks of arriving in the United States is sufficiently specific.

on April 8. (Def. Ex. 8). Instead, Respondent and AM left Mexico before the end of March, presumably to avoid notification that she should not leave Mexico until a custody agreement was in place as Petitioner had planned.[25]

On March 31, Respondent sent Petitioner a text message stating that she did not want to live in Delicias, Mexico. In April 2019, Petitioner visited Respondent and AM in Nashville, Tennessee. While he was there, Petitioner left letters for Respondent and Respondent's mother, both of which clearly outlined Petitioner's demand for AM to return to Mexico.

Since coming to the United States in October 2018, AM has been enrolled in daycare and has spent time with local relatives.

Petitioner filed a petition in a Mexican court on May 15, 2019. That court ruled that it did not have jurisdiction, and on June 12, 2019, Petitioner filed an Application to the Secretary of Exterior Affairs in Mexico seeking the return of AM.[26] On October 1, 2019, Petitioner filed the

---

[25] It is unclear from the record whether Respondent was actually notified while on this trip to Mexico, or whether instead she became aware of the impending notification and left prematurely. Respondent offered no other explanation for her early departure than that offered by Petitioner and Carlos Baca.

[26] As suggested above, the Court has concerns regarding the Petitioner's June 2019 application with the Mexican Secretary of Exterior Affairs to retrieve AM. In describing the dispute between himself and Respondent, Petitioner describes Respondent and AM's trip to American as a "vacation" (or "vacations") several times. (Pl. Ex. 1). Respondent and AM's length of time in the United States prior to their return to Delicias on March 22, 2019—when, Petitioner claimed in the application, the "vacation" came to an end, was nearly six months. And during this time period, as Petitioner well knew (and to his credit disclosed on the application), Respondent and AM made a multi-week trips *back to Delicias*, a fact that tends to undercut the reasonableness of Petitioner's alleged belief that Respondent's and AM's time in Tennessee was for "vacation." Indeed, all of this should have indicated to Petitioner that Respondent and AM were not merely on "vacation." The Court recognizes the issues and unclarity that can be fostered by language barriers and translation (such as the translation of this application from Spanish into English), but Petitioner's testimony as to why he used the term "vacation" removes any possibility that language barriers or translation issues are to blame for the English version referring to "vacation"; Petitioner testified that he thought this was a fair word.

pending Petition under the Hague Convention, asserting that Respondent wrongfully removed AM from Mexico and seeking AM's prompt return to Mexico.

## CONCLUSIONS OF LAW

**I.**     **The Hague Convention and the requirements for a prima facie case thereunder**

In 1980, at the Hague Conference on Private International Law, twenty-nine states ("Contracting States") convened and enacted the Hague Convention in order to accomplish the following objectives: (1) "to secure the prompt return of children wrongfully removed to or retained in any Contracting State"; and (2) "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." Hague Convention, art. 1. The Convention seeks to "preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court." *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) (hereinafter "*Friedrich I*") (citation omitted). This Court "has jurisdiction to decide the merits of an abduction claim, but not the merits of the underlying custody dispute." *Friedrich v. Friedrich*, 78 F.3d 1060, 1063–64 (6th Cir. 1996) (hereinafter "*Friedrich II*") (citing Hague Convention, Article 19).

The United States and Mexico are both signatories to the Hague Convention. Congress ratified and implemented the Hague Convention by enacting the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq*. The Hague Convention applies if (1) the children were "habitually resident in a Contracting State immediately before any breach of custody or access rights" and (2) the children are under the age of sixteen. Hague Convention, art 4. The parties have stipulated that AM was a resident of Mexico prior to October 2018 and that AM is under the age of sixteen, as clearly he is by a wide margin.

A petitioner who initiates judicial proceedings for the return of a child under the Hague Convention has the burden to prove, by a preponderance of the evidence, that the child has been wrongfully removed or retained. 22 U.S.C. § 9003(b), (e)(1)(A). Under Article 3 of the Convention:

> The removal or the retention of a child is to be considered wrongful where—
>
> (a) [the retention of the child] is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Convention art. 3. The issue before the Court is one of alleged wrongful retention of AM in the United States, not one of wrongful removal from Mexico.[27]

As explained earlier this year by a district court in this circuit:

> A prima facie case of wrongful removal [or retention] thus has three elements: 1) prior to removal or wrongful retention, the child was habitually resident in a foreign country; 2) the removal or retention was in breach of custody rights under the foreign country's law; and 3) the petitioner was exercising custody rights at the time of the removal or wrongful retention. 42 U.S.C. § 11603(e) provides the petitioner must successfully prove a prima facie case by the preponderance of the evidence. Once a petitioner has met their burden, a court shall order return of the child to their home country unless a respondent can show one of five enumerated affirmative defenses.

---

[27] There has been confusion both in the parties' briefs and at trial regarding whether this is a removal or a retention case under the Hague Convention. Petitioner raised both arguments in the Final Joint Proposed Pretrial Order, without objection from Respondent. (Doc. No. 19). Since AM was initially taken with his father's permission (contrary to representations Petitioner, regrettably, has made at times in filings in this case), the proper analysis is that of a retention, not of a removal. The prima facie case and analysis regarding a "removal" versus a "retention" are similar in many ways, and many courts opt to discuss both types of action under the Hague Convention together when stating the law. The Court has left references in to "removal" as well as "retention" when quoting and citing from courts that conflate the analysis as such, but the Court fully recognizes that the issue before it is one of retention, not one of removal.

*Jimenez Blancarte v. Ponce Santamaria*, No. 19-13189, 2020 WL 38932, at *2 (E.D. Mich. Jan. 3, 2020); *Roche v. Hartz*, 783 F. Supp. 2d 995, 1000 (N.D. Ohio 2011) (noting the requirements of a prima facie case based on alleged wrongful retention). And as noted above, "the petitioner must successfully prove a prima facie case by the preponderance of the evidence." *Id.* If the petitioner is able to do so, the "court shall order return of the child to their home country unless a respondent can show one of five enumerated affirmative defenses." *Id.*[28] *See also* Convention, art. 12 (noting, *inter alia*, that if the court determines that the child has been wrongfully retained, and the petition was filed within one year of the date of the wrongful removal or retention, the court "shall order the return of the child forthwith").[29]

---

[28] If a petitioner successfully establishes a prima facie case of wrongful retention, the court must determine whether the respondent has established that any of the Hague Convention's affirmative defenses apply. *See* 22 U.S.C. § 9003(e)(2); *Friedrich II*, 78 F.3d at 1067. These affirmative defenses are as follows: (1) the proceeding was commenced more than one year after the removal of the child and the child has become settled in his or her new environment; (2) the person seeking return of the child consented to or subsequently acquiesced in the removal or retention; (3) there is a grave risk that the return of the child would expose them to physical or psychological harm or would otherwise place the child in an intolerable situation; and (4) the return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." *See* Convention, arts. 12, 13(a)–(b), 20; 22 U.S.C. § 9003(e)(2)(A)–(B). The Sixth Circuit has stressed that the exceptions are to be interpreted narrowly. *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007). A district court has considerable discretion in determining whether or not a child should be returned. Even if a respondent establishes an affirmative defense, the district court can still decide that the child should be returned. *De La Riva v. Soto*, 183 F. Supp. 3d 1182, 1187 (M.D. Fla. 2016). In the case before this Court, Respondent has waived her affirmative defense of consent or acquiescence. This defense must be proven by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B); *Alanis v. Reyes*, 230 F. Supp. 3d 535, 545 (N.D. Miss. 2017) (analyzing the case of a Respondent who waived affirmative defenses). And in any event, Respondent has failed to show by a preponderance of the evidence that Petitioner consented or acquiesced to AM's presence in the United States after February 9, 2019.

[29] As this petition in this case was filed on October 1, 2019, and there is no question that the alleged wrongful retention occurred after October 1, 2018, the petition clearly was filed within the applicable one-year period.

Courts considering whether a retention is wrongful under Article 3 of the Hague Convention—a question that encompasses the first two elements as stated by *Jimenez Blancarte*—must answer the following four questions:[30]

---

[30] The Court notes that there are actually two questions before it: 1) was there a retention, and, if so, 2) was the retention "wrongful"? However, many courts in this circuit have conflated, and used interchangeably, the terms "retention" and "wrongful retention." In this vein, courts have simplified the concept of wrongful retention to mean "the act of keeping the child in a country without consent of the person who was actually exercising custody." *McKie v. Jude*, No. CIV.A. 10-103-DLB, 2011 WL 53058, at *6 (E.D. Ky. Jan. 7, 2011); *Guevara v. Soto*, 180 F. Supp. 3d 517, 524–25 (E.D. Tenn. 2016); *March v. Levine*, 136 F. Supp. 2d 831, 835 (M.D. Tenn. 2000), *aff'd*, 249 F.3d 462 (6th Cir. 2001).

The Court finds that it should neither (1) treat "retention" and "wrongful retention" interchangeably nor (2) automatically define "wrongful retention" to mean, essentially, "retention without the consent of the petitioner." The text of the Hague Convention is inconsistent with doing either of those things. As for the latter, the Hague Convention clearly contemplates a distinction between "retention" generally and retention that is "wrongful." Convention art. 3 ("The . . . retention of a child is to be considered wrongful where . . . ."). And as for the former, "wrongful" retention is defined as a retention that "is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention," provided that "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." *Id.* art. 3(a). Therefore, the Court can determine initially whether there was a retention without determining whether the retention was wrongful. And the Court can (and must) determine the date of the retention, and then determine (as of the day before the retention date) the country of AM's habitual residence. Notably, the Hague Convention indicates that the determination of habitual residence should be made not at the time the retention *became wrongful*, but rather the time the retention *occurred* (which could have been earlier, depending on the substance of the applicable law used to determine whether—and if so, when—a retention breached the petitioner's custody rights). *See id.* art. 3(b).

If AM's habitual residence, as of the day before the date of retention, was the United States (rather than Mexico), then the retention was not wrongful. *Flores-Aldape v. Kamash*, 202 F. Supp. 3d 793, 801 (N.D. Ohio 2016) ("If [the child] was a habitual resident of the United States as of [the day before the child's retention], 2015, her retention was not wrongful. However, if she was a habitual resident of Mexico on that date, her retention was wrongful under the Hague Convention[.]"); *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 271 (3d Cir. 2007) ("[I]f we hold that the United States was [the child's] habitual residence [on the date of retention], the analysis is complete as the Hague Convention would not apply because her retention in the United States would not be wrongful as defined by Article 3."); *Selo v. Selo*, 929 F. Supp. 2d 718, 726 (E.D. Mich. 2013) ("A petitioner cannot claim that a retention of a child is 'wrongful' under the Hague Convention unless the child to whom the petitioner relates was [at the time of retention] 'habitually resident' in a State signatory to the Convention and was retained in a different state."); *Miller v. Miller*, No. 1:18-CV-86, 2018 WL 4008779, at *16 (E.D. Tenn. Aug. 22, 2018) ("[Petitioner] fails

(1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?

*Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir. 2006); *Baxter v. Baxter*, 423 F.3d 363, 368 (3d Cir. 2005) (citing *Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001)).

## II.    Overview of issues concerning Petitioner's prima facie case

At this juncture, as noted, the claim before the Court is one of alleged wrongful retention of AM in the United States, not wrongful removal from Mexico. The parties have stipulated, *inter alia*, that both Petitioner and Respondent were actually exercising their custody rights. (Doc. No. 19 at 2-3). And the evidence shows that Petitioner had an active role in AM's life in Mexico and that Petitioner continued to be active in his child's life remotely after the move to the United States, such that Petitioner is properly deemed to have been exercising his custody rights at all times even potentially relevant to the claim of wrongful retention.

That leaves Petitioner with the burden of establishing, by a preponderance of the evidence, the remaining two elements of a claim of wrongful retention. As noted above, the two elements collectively address whether there has been a wrongful retention. But, as *Jimenez Blancarte* suggests, it is appropriate to break this inquiry into two elements—meaning that if Petitioner fails to establish either element by a preponderance, his claim fails.

---

to establish by a preponderance of the evidence that Canada was the children's habitual residence at the time of their retention in Chattanooga—whether the Court views the date of retention as March 27, 2018, or November 17, 2017. Their retention in Chattanooga is therefore not 'wrongful' as the Hague Convention defines the term."). In other words, Petitioner has to show (by a preponderance) that as of that date, AM's country of habitual residence remained Mexico, *i.e.*, had not changed to the United States. So if the Court determines that Petitioner has failed to show by a preponderance that AM's habitual residence had *not* changed to the United States, Petitioner fails to meet his burden of showing wrongful retention.

The Court will start with the first of these two elements, *i.e.*, that immediately prior to removal or retention, the child was habitually resident in a foreign country. Here, that means Petitioner must show (by a preponderance, as noted) that immediately prior to the retention, AM was a habitual resident of Mexico, not the United States. Whether Petitioner has made the required showing turns on when the retention occurred and what AM's habitual residence was immediately preceding the retention. *See Flores-Aldape v. Kamash*, 202 F. Supp. 3d 793, 801 (N.D. Ohio 2016). In a retention case, if the child's habitual residence immediately prior to the alleged retention date has switched to the new country, the child will not be returned to the old habitual residence, but instead will remain in the new habitual residence. *Id.*

One may be concerned about the possibility of a parent being rewarded for *wrongfully* keeping a child in a new country long enough to establish a habitual residence there (to that litigant's immense litigative advantage). This might occur if, for example, the parent wrongfully removed the child and then essentially hid in the new country long enough for the child to become acclimated to the new country. But that concern is not implicated here, because the habitual residence is determined as of the time immediately prior to retention in the new country—even if the retention was not wrongful as of that time. And even if the retention in this case was wrongful from the very beginning, the applicable date is the date of that (wrongful) retention and is not postponed beyond the time of the beginning of the wrongful conduct (the wrongful retention). Thus, in this case, the date for determining habitual residence was not delayed (to Respondent's advantage) based on wrongdoing by Respondent. In any event, the law requires the Court to determine the habitual residence of the child immediately prior to the retention, and the Court therefore will make that determination.

It has been stipulated that prior to October 1, 2018, AM's habitual residence was Delicias, Mexico.[31] But since the Court finds that the retention of AM occurred on February 9, 2019, the examination of AM's habitual residence will focus on February 8, 2019, the time immediately preceding the date of retention. For the reasons set forth below, the Court finds Petitioner has failed to show by a preponderance that as of February 8, 2019, AM was a habitual resident of Mexico rather than the United States.

### III. Retention Date

Article 3 of the Hague Convention specifies the circumstances under which a "retention" is "wrongful." In this sense, it may be said to define "wrongful" retention. But the Hague Convention (and, for that matter, ICARA) does not define "retention" or otherwise indicate when a "retention" is properly deemed to have occurred. Thus, the Court looks to case law to identify the appropriate test for determining the date of retention, and it finds the test employed by the Third Circuit to be appropriate.

"Building on *Karkkainen*, we hold that the retention date is the date beyond which the noncustodial parent no longer consents to the child's continued habitation with the custodial parent and instead seeks to reassert custody rights, as clearly and unequivocally communicated through words, actions, or some combination thereof. That determination is, by necessity, fact-intensive and will vary with the circumstances of each case." *Blackledge v. Blackledge*, 866 F.3d 169, 179

---

[31] There is significant disagreement between the parties, both at trial and in their briefing, regarding the scope of the stipulation that AM's habitual residence was Mexico. The parties stipulated only to AM's habitual residence leading up to October 1, 2018. As discussed herein, the date of AM's retention was later than October 2018, and the parties have not stipulated to, and in fact presented little evidence of, AM's habitual residence from the time period post-stipulation date to retention date.

(3d Cir. 2017); *see also Palencia v. Perez*, 921 F.3d 1333, 1342 (11th Cir.).[32] Under this test, when a petitioning parent gives initial consent for a child to be taken to another country for a period of time, "a 'retention' does not begin until the non-custodial parent clearly communicates his or her desire to regain custody and asserts his or her parental right to have the child returned." *Selo v. Selo*, 929 F. Supp. 2d 718, 727 (E.D. Mich. 2013) (citing *Karkkainen*, 445 F.3d at 290). This communication does not need to be in words; an action such as filing a petition for a child's return "unequivocally signal[s] . . . opposition." *Karkkainen*, 445 F.3d at 290.

The date of retention in the present case occurred no earlier than February 9, 2019. On that date, Petitioner texted Respondent that he felt "cheated" (by which he meant "tricked") and that "this has to stop." Respondent was not receptive to Petitioner's text messages, and she told Petitioner that she would not be coming back to Mexico. Petitioner understood at this time that Respondent would not be returning to Mexico. Petitioner explained that he sent this text message and used the word "cheated" because Respondent had moved to Nashville with the intention of

---

[32] District courts in the Sixth Circuit usually apply this test and/or another test, which looks at "when the acts of the abducting parent are so unequivocal that the left behind parents knows or should know, that the child will not be returned." *Lopez Moreno v. Zank*, No. 1:17-CV-732, 2020 WL 1950834, at *3 (W.D. Mich. Apr. 23, 2020). The Sixth Circuit has not indicated which test is appropriate. *Id.* When employing the second test, courts often speak of retention in terms of "wrongful retention," instead of "retention," which as the Court has previously noted may be a result of courts conflating into a single question what this Court sees as two separate questions. Though the Court analyzes this case under the *Blackledge* test, the *Blackledge* test is similar to the second test, and the Court believes the result would be the same under either. Under the second test, courts analyzing wrongful retention claims "look to the last date upon which it is undisputed that the child was present in the new country with both parents' permission." *McKie*, 2011 WL 53058 at *6. "In other words, to determine the date of wrongful retention courts will look to the date where the non-abducting parent was truly on notice that the abducting parent was not going to return with the child." *Id.* Here, the non-abducting parent (Petitioner) was on notice as of February 9 that the other parent (Respondent) would not return with the child. Respondent telling Petitioner that she and AM would not be returning to Mexico is an "unequivocal" statement that put Petitioner on notice that AM would not be returned to Mexico. *See Lopez Moreno*, 2020 WL 1950834, at *3. Therefore, under either test, the Court would find the retention date to be February 9, 2019.

staying there without consulting Petitioner or getting his consent. Petitioner "clearly communicat[ed]" his desire to have AM returned with his statement "this has to stop." *Selo*, 929 F. Supp. 2d at 727; *Flores-Aldape*, 202 F. Supp. 3d at 801 (finding date of retention when petitioner emailed respondent "[y]ou have stolen my baby from me").

Petitioner then hired an attorney in Mexico, and Petitioner bought two plane tickets to Mexico for Respondent and AM in an attempt to give notification to Respondent in Mexico that she could not leave until they had a custody agreement.[33] Petitioner did not testify as to the exact date he retained counsel. However, the plane tickets were purchased in connection with a plan to serve Respondent in Mexico, and the plane tickets were paid for on February 12, 2019. (Def. Ex. 8). It appears that after expressing his objection to AM remaining in the United States, Petitioner quickly consulted an attorney and purchased plane tickets in order to institute legal proceedings in Mexico. Viewed in "combination" with his text message, Petitioner's actions after his text message that "this has to stop" also serve as a "clear[] and unequivocal[] communicat[ion]." *Blackledge*, 866 F.3d at 179.

For these reasons, the Court finds that the date of retention is February 9, 2019.[34] The Court certainly cannot find that retention occurred any earlier, and although the Court can see how it

_____

[34] At trial and in briefing, Petitioner dedicated himself to the argument that the wrongful retention occurred in October 2018. Petitioner argues that his consent for AM to live in the United States with Respondent was conditional on the three of them living together as a family unit and couple, and when Respondent broke off the relationship, AM was necessarily in the United States without Respondent's consent in October 2018 and was therefore wrongfully retained as of the time of the breaking off. A line of cases indicates that living together as a family unit can be a condition on the consent of one parent to take a child to another country. *See e.g.*, *A.A.M. v. J.L.R.C.*, 840 F. Supp. 2d 624, 638 (E.D.N.Y.), *aff'd sub nom. Mota v. Castillo*, 692 F.3d 108 (2d Cir. 2012) (holding that there had been "[n]o consent for retention in the United States" because it was "conditional on all of the family members entering the United States"). However, this line of cases analyzes the condition of a family unit as part of the analysis of the "shared intent" prong of habitual residence or as part of the analysis of the affirmative defense of consent. *See e.g.*, *Hofmann*

might have occurred later, it will—to Petitioner's benefit, and in an abundance of caution—fix the retention date as the earliest one possible.[35] It is apparent from Petitioner's testimony that he did not believe the move was permanent until sometime in February, after Respondent had returned to Mexico for a few weeks and then gone back to Nashville. Though Petitioner made some comments about wishing to see AM and being upset with the arrangement prior to February 2019, Petitioner also implied that things could be different if he and Respondent were able to be together romantically, consented to AM remaining in the United States until he and Respondent could discuss it over the winter holidays, and made no clear statements protesting AM's presence in the

_____

*v. Sender*, 716 F.3d 282, 296 (2d Cir. 2013) (finding wrongful retention when father was stopped from asserting custody rights, and discussing the issue of an unmet condition precedent in the context of the "shared intent" prong); *In re AAUM*, No. 16-CV-6126 (BMC), 2018 WL 2451199, at *3 (E.D.N.Y. May 31, 2018) (discussing the issue of consent and conditions in the context of both "shared intent" and the consent affirmative defense); *Sanguineti v. Boqvist*, No. 15-CV-3159 PKC, 2015 WL 4560787, at *15 (S.D.N.Y. July 24, 2015) (discussing at length the issue of consent and conditions precedents not being met in the "shared intent" prong of the habitual residence analysis). The "shared intent" prong of the habitual resident test has been rejected by the Sixth Circuit, except in the case of infants. *Robert v. Tesson*, 507 F.3d 981, 990 (6th Cir. 2007) (calling the "shared intent" prong "incompatible" with the Sixth Circuit approach); *Friedrich I*, 983 F.2d at 1401 ("To determine the habitual residence, the court must focus on the child, not the parents, and examine past experience, not future intentions."); *Selo v. Selo*, 929 F. Supp. 2d 718, 729 (E.D. Mich. 2013) ("This Court is bound to follow Sixth Circuit authority and that authority makes clear that this Court *cannot* look to the subjective intentions of the parents in determining the child's habitual residence." (citing *Robert,* 507 F.3d at 989–92)); *see also Taglieri v. Monasky*, 907 F.3d 404, 408 (6th Cir. 2018), *cert. granted*, 139 S. Ct. 2691, 204 L. Ed. 2d 1089 (2019), *aff'd*, 140 S. Ct. 719 (2020) (upholding use of the shared intent analysis when a two month old would not be able to acclimate to a new country as required by the Sixth Circuit test). The Respondent has waived the affirmative defense of consent, and AM was not an infant at the time of retention. Therefore, the Court is unconvinced that Petitioner's supposed conditional consent would have resulted in an automatic wrongful retention in October 2018 when Respondent made clear that there was no possibility going forward that the alleged condition would be satisfied.

[35] If the Court had pinned the retention date later, the analysis would remain the same, except that AM would have had more time to acclimate to the United States. Otherwise, the Court would rely on the same evidence to determine that AM's habitual residence was the United States going forward from this date (February 9, 2019) into the Spring of 2019, and Petitioner has produced no evidence suggesting that AM's habitual residence somehow might have changed back to Mexico at any time after February 9, 2020.

United States. *See Miller v. Miller*, No. 1:18-CV-86, 2018 WL 4008779, at *13 (E.D. Tenn. Aug. 22, 2018) (finding no retention yet when Petitioner made only "tepid communication of his desire for the children to return" and "merely an expression of [Petitioner's] preference—not a clear or explicit demonstration of opposition to the status quo" or a "forceful communication").

As set forth elsewhere herein, Petitioner does very little to address the possibility that the date of the retention was any later than October 17, 2018. But in making a point on a different issue, Petitioner does say a couple of things that, if true, would very much support the notion that the retention was already wrongful by some point prior to the end of October: "There is simply nothing in the record to contradict [Petitioner's] and Mr. Baca's testimony, which is corroborated by text messages over the following months, that [Petitioner] objected to the retention in October of 2018 after Respondent reneged on the agreement." (Doc. No. 3). This is, to put it bluntly, nonsense. To begin with, Respondent's testimony contradicts this. Moreover, Petitioner's very own signed application to the Mexican Secretary of Exterior Affairs contradicts this. Therein, far from saying that he "objected to the retention in October of 2018" (or that such objection came after Respondent had "reneged on [some] agreement,") Petitioner: (1) represented that Respondent and AM were on a mere vacation all the way until March 22, 2019; (2) omits any references whatsoever that he objected to AM's (or Respondent's) presence in the United States prior to March 22, 2019; and instead (3) indicates that he had prior to that time given "verbal consent" to this; and (4) suggests that his first objection arose when AM and respondent traveled back to Tennessee on March 29. This most certainly is evidence that starkly contradicts the testimony on which Petitioner here relies; it is also devastating to Petitioner's credibility on this issue.

In a similar vein, Petitioner asserts that "Respondent offers no proof to rebut the sworn testimony of [Petitioner], Mr. Baca, and Respondent that [Petitioner] objected to the retention

almost immediately after Respondent reneged on the agreement." (Doc. No. 42 at 3). This is likewise false;[36] Respondent did not testify that Petitioner objected to the retention of AM in the United States after she (on October 17, 2018, according to Petitioner) reneged on the agreement (which the Court believes is properly characterized as an agreement to live together as a family unit of three in the United States). Rather, she presented testimony that rebutted any notion that Petitioner objected to the retention of AM in the United States after Respondent changed her mind about her relationship (and living together) with him. And although it is true that it was Petitioner rather than Respondent who offered into evidence Petitioner's application to the Mexican Secretary of Exterior Affairs, the fact remains that the application directly rebuts any claim that Petitioner objected to the retention almost immediately after Respondent reneged on the agreement.

## IV. Habitual Residence

As an initial matter, the Court rejects Petitioner's assertion in his most recent filing that "Respondent does not contend that the first [element of Petitioner's prima facie case, *i.e.*, place of habitual residence, is] in dispute." (Doc. No. 42 at 1). In an earlier filing, Petitioner himself noted numerous times that Respondent contended at trial that the applicable country of habitual residence was the United States and not Mexico as asserted by Petitioner. (Doc. No. 43 at 2) (quoting Doc.

---

[36] The Court is not sure why Petitioner makes this contention. Though, as previously noted, counsel did not have access to a transcript when drafting, Respondent clearly rebuts this in her testimony, and no transcript should have been necessary to recall and understand this. It is possible that Petitioner is confused by what exactly he was objecting to, and therefore what, exactly, Respondent could be rebutting. Petitioner states that he "objected to the retention." What Petitioner may mean instead by this phrase is that he objected to not being able to live in the United States as a family unit with Respondent, or that Petitioner objected to not being with AM (wherever that may be). But the problem is that Petitioner's contention here as stated is that Respondent offered no proof to rebut that Petitioner objected to the "retention."

No. 40 at 3-4, 4, 5, 8)). It is true that after Respondent became convinced—erroneously—[37]that Petitioner could prevail *only* by establishing wrongful retention by the particular date (October 17, 2018) he claimed was the date of wrongful retention, Respondent stopped contending that the applicable country of habitual residence had changed from Mexico; erroneously concluding that the wrongful retention occurred either by October 17, 2018 or not at all, Respondent effectively conceded that AM's country of habitual residence was Mexico as of October 17, 2018, (Doc. No. 43 at 3), and imprudently did not bother specifically arguing that the country of habitual residence had changed to the United States by some later date. But that is *not* to say that Respondent conceded that AM's country of habitual residence was still Mexico *after* October 2018; to the contrary, Respondent made clear that she did no such thing, and that her concession related only to October 2018. (Doc. No. 53 at 2). So in considering (apparently to Respondent's surprise) the possibility that the wrongful retention occurred (if at all) after October 2018, the Court does not deem Respondent to have conceded (ever) that AM's habitual residence had not changed to the United States after October 2018.

As for Petitioner's related argument that "Respondent has not argued in her briefing that the habitual residence in this matter was anywhere other than Mexico at the time of any alleged wrongful retention," (Doc. No. 42 at 1), it is true that Respondent has not argued that the habitual residence of AM was anywhere other than Mexico as of the date *Petitioner alleges* was the date of wrongful retention. But in the Court's view, Respondent unmistakably implied in her proposed findings of fact and conclusions of law that AM's place of habitual residence has changed to the United States by the *actual date* of the retention as correctly determined. (Doc. No. 41 at 2-3). And

_____

[37] As suggested elsewhere herein, Respondent's conviction here was erroneous because *the Court* decides when the wrongful retention (assuming there was one) occurred, and in so deciding it is not limited to the date(s) asserted and/or assumed arguendo by the parties.

Respondent certainly was clear in her last filing that although she concedes that AM's country of habitual residence was Mexico *in October 2018*, she does not concede that the applicable country of habitual residence is Mexico as claimed by Petitioner.

"The Hague Convention does not define 'habitual residence,' placing courts in a position to bring illumination to it." *Miller*, 2018 WL 4008779, at *11. The Supreme Court has indicated that determining a child's habitual residence is a mixed question of law and fact which requires examination of a totality of the circumstances. *Monasky v. Taglieri*, 140 S. Ct. 719, 730 (2020) (discussing the habitual residence of an infant). In determining a child's place of habitual residence, the Sixth Circuit applies the acclimatization test unless the child at issue is an infant such that he or she lacks cognizance of his or her surroundings. *Ahmed v. Ahmed*, 867 F.3d 682, 687-89 (6th Cir. 2017).[38] "A child's habitual residence is the nation where, at the time of their

---

[38] In the Sixth Circuit, the oldest age where the parental intent standard has been used was for a child who was two years and four months old on the date of wrongful retention. *Carvajal Vasquez v. Gamba Acevedo*, 931 F.3d 519, 526 (6th Cir. 2019). In cases where the shared intent standard is deemed applicable, an infant is usually only a few months old to two years old and unable to make meaningful connections to their surroundings. *See e.g.*, *Monasky*, 140 S. Ct. at 724 (two-month-old child); *Ahmed*, 867 F.3d at 687 (approximately seven-month-old twins). Though there is not necessarily an age ceiling past which a Court can no longer look at parental intent, children of over three years old are usually found to possess the ability to "form meaningful connections with the people and places [they] encounter[] each day." *Carvajal*, 931 F.3d at 526 (implying that the acclimatization standard is likely appropriate for a four-year-old child) (quoting *Whiting v. Krassner*, 391 F.3d 540, 550–51 (3d Cir. 2004)); *Capalungan v. Lee*, No. 2:18-CV-1276, 2019 WL 1872978, at *7 (S.D. Ohio Apr. 26, 2019), *report and recommendation adopted*, No. 2:18-CV-1276, 2019 WL 3072139 (S.D. Ohio July 15, 2019) (finding acclimatization standard appropriate for five-year-old child and noting that two years old is usually the oldest age where a court will consider shared parental intent). Neither party has argued or presented evidence that AM should be considered an infant for purposes of the Sixth Circuit's habitual residence test or that he does not possess the ability to form connections with his surroundings and with others. AM was born on January 6, 2015. (Pl. Ex. 1). At the time of moving to the United States in October of 2018, he would have been a little over three and a half years old. At the time of retention in February 2019, the determinative date, he would have recently turned four. The record additionally indicates that AM was old enough to participate in school (in Mexico), day care (in America), and have relationships with family, such as his mother, father, and grandparents. Thus, the Court finds that the acclimatization standard is most appropriate for this case.

removal, the child has been present long enough to allow acclimatization, and where this presence has a 'degree of settled purpose from the child's perspective.'" *Robert v. Tesson*, 507 F.3d 981, 993 (6th Cir. 2007) (quoting *Feder v. Evans-Feder*, 63 F.3d 217, 224 (1995)). This inquiry should "focus on the child, not the parents, and examine past experience, not future intentions." *Friedrich I*, 983 F.2d at 1401. Academic activities, social engagements, participation in sports, connections with people and places, and moving belongings can all show "a settled purpose to reside in the United States." *Jenkins v. Jenkins*, 569 F.3d 549, 556 (6th Cir. 2009) (quoting *Robert*, 507 F.3d at 996). Additionally, "there need not be a decision to remain somewhere indefinitely for it to be considered the child's habitual residence." *Mar. v. Levine*, 136 F. Supp. 2d 831, 840 (M.D. Tenn. 2000), *aff'd*, 249 F.3d 462 (6th Cir. 2001). As noted by the Third Circuit:

> This approach considers a child's experience in and contacts with her surroundings, focusing on whether she "develop[ed] a certain routine and acquire[d] a sense of environmental normalcy" by "form[ing] meaningful connections with the people and places [she] encountered" in a country prior to the retention date. We examine a child's conduct and experiences to determine whether she became "firmly rooted" in her new surroundings, not merely whether she acculturated to a country's language or customs. Thus, if a child becomes rooted in one country, we will not return her to another one where doing so would take her "out of the family and social environment in which [her] life has developed." Simply put, this inquiry considers whether a child has made a country her home before the date of her removal or retention.

*Karkkainen*, 445 F.3d at 292 (citations omitted).

The Sixth Circuit has enumerated five principles to guide complicated decisions of a child's habitual residence:

> First, habitual residence should not be determined through the technical rules governing legal residence or common law domicile. Instead, courts should look closely at the facts and circumstances of each case. Second, because the Hague Convention is concerned with the habitual residence of the child, the court should consider only the child's experience in determining habitual residence. Third, this inquiry should focus exclusively on the child's past experience. Any future plans that the parents may have are irrelevant to our inquiry. Fourth, a person can have only one habitual residence. Finally, a child's habitual residence is not determined

by the nationality of the child's primary care-giver. Only a change in geography and the passage of time may combine to establish a new habitual residence.

*Panteleris v. Panteleris*, 601 F. App'x 345, 349 (6th Cir. 2015) (quoting *Robert*, 507 F.3d at 989) (internal citations, quotation marks, and alterations omitted). Crucially, the petitioner bears the burden to show habitual residence. *Carvajal Vasquez v. Gamba Acevedo*, 931 F.3d 519, 525 (6th Cir. 2019).

Where there is no dispute as to what the child's country of habitual residence was as of a certain date, it is appropriate for the court to reframe the question in terms of whether the country of habitual residence *changed* after that date. *Robert*, 507 F.3d at 997 ("[T]he remaining question is whether or not [the children's] habitual residence changed from the United States to France during their three week stay [in France]."); *Karkkainen*, 445 F.3d at 293 (framing the issue as whether the child's "habitual residence changed from Finland to the United States"). The question turns in part on what the evidence suggests about whether the child would have perceived his "stay in [the new country] to be merely a temporary journey before they returned to a permanent residence in the [prior country of habitual residence]." *Robert*, 507 F.3d at 997. In assessing the child's likely perception, the court should consider whether the parent in the new country conveyed to the child that the child should expect a long stay, and the extent to which the child was welcomed upon arrival in the new country. *Id.*

In answering the question of whether habitual residence has changed, the Court should consider not only the extent to which the evidence suggests that AM acclimatized to the new country (the United States), but also the extent to which the evidence suggests abandonment of the original country of habitual residence (Mexico). That is because it "'seem[s] implicit in the concept of acquiring a new 'habitual' residence that the previous 'habitual' residence has been left behind or discarded.'" *Id.* (quoting *Karkkainen*, 445 F.3d at 294). *The Court* should assess whether the

child would likely perceive that he had arrived in the new country with "the settled purpose to leave" the prior country of habitual residence behind and make a new habitual residence in the new country. *Id.* at 998. In addition, although (as noted above) the Court does not focus on the parents' subjective shared intentions, and likewise does not focus on one parent's unilateral intentions, it *does* focus on what the child's parents—and perhaps even just the one parent in the new country—objectively communicated to the child about the child's stay in the new country. *Id.* at 996 (quoting *Karkkainen*, 445 F.3d at 294 (focusing on how the parent with the child in the new country "colored [the child's] attitude" about the stay in the new country)).

Respondent and Petitioner stipulated prior to trial that before October 1, 2018, AM's habitual residence was Mexico. So it is appropriate to view the question as whether AM's country of habitual residence changed from Mexico to the United States *after* October 1, 2018 In connection with this crucial question, the Court, *sua sponte*, has endeavored to see whether there is any authority to support either of two similar propositions, each of which, if valid, could significantly aid Petitioner in this case: that even though the petitioner (at least generally) bears the burden of proof on the issue of habitual residence, (1) the burden nevertheless somehow falls on the respondent if the respondent is relying on a claim that the country of habitual residence *changed* from a different country that undisputedly had been the country of habitual residence; or (2) the petitioner, in meeting his burden, is entitled to some sort of rebuttable presumption that a country, if undisputedly the country of habitual residence at one juncture, *did not change* later from that country to another country to which petitioner claims it never changed.[39]

---

[39] The Court realizes that it takes some time (the amount of which will vary depending on the circumstances) for a country of habitual residence to change, and the Court has this squarely in mind. For example, the Court realizes that, armed with a stipulation that AM's country of habitual residence was Mexico on October 1, 2018, Petitioner would be in great shape to show that the country of habitual residence had not changed by October 17, 2018, even without introducing any

But the Court has found no such authority, and Petitioner certainly has not provided any. Indeed, beyond merely acknowledging that he bears the burden of proof (by a preponderance) to show that at the relevant time (the time of either wrongful removal or wrongful retention), Petitioner has nothing to say about any issues related to the parties' respective burdens.

In the end, the Court is necessarily constrained to hold that even though AM's country of habitual residence was Mexico on October 1, 2018,[40] Petitioner bears the burden to show that it was still Mexico—*i.e.*, the burden to show that it had not changed—by the time of retention. This

---

evidence at all (beyond the stipulation) as to what AM's country of habitual residence was as of October 17, 2018. Indeed, Respondent effectively concedes that there was no such change. (Doc. No. 43 at 3). But as time advances beyond October 2018, the fact that the country of habitual residence was Mexico as of October 1, 2018 becomes increasingly less important. And by February 8, 2019, there is only so much this fact can do for Petitioner by itself, especially given that apparently (1) the burden is not on Respondent to show a change in country of habitual residence; and (2) Petitioner is not entitled to a rebuttable presumption that there was no change in the country of habitual residence. In other words, it is one thing to say that Petitioner, in attempting to meet his burden, can rely on the brevity of the period at issue to argue that the country of habitual residence did not change during that period; but it is quite another to say that on this issue Respondent bears some burden (*i.e.*, a burden of persuasion on the issue of whether there was such a change, or at least a burden of production to rebut a presumption that there was a change).

[40] To the extent Petitioner would still contend that Respondent, in stipulating to Mexico as the country of habitual residence as of October 1, 2018, stipulated that Mexico was the country of habitual residence *at the time of the alleged wrongful retention*, the Court would point to yet another reason to reject the contention. The stipulation first appears in the record in the Joint Proposed Pretrial Order. (Doc. No. 19 at 2-3). As noted elsewhere herein, in that same document, Petitioner begins the description of his theory of the case as follows: "This case centers around the wrongful removal of a minor child, AM, from Mexico to the United States in late October 2018." (*Id.* at 1). In other words, according to Petitioner here, the removal from Mexico (which is incorrectly alleged here to have ben wrongful) did not occur until late October 2018. So any wrongful retention would have had to have occurred sometime after that, and Petitioner here implies strongly that it occurred "about two weeks after" the removal. (*Id.* at 2). So the date to which the stipulation was pegged was *not* the date on which Petitioner, at the time the stipulation was announced, was alleging was the date of either a wrongful retention or a wrongful removal; Petitioner represented the former date to be approximately a month later and the latter date nearly a month and a half later. So the context in which the stipulation was announced shows that it did not purport to say what the country of habitual residence was at the time of any alleged wrongful retention (or wrongful removal, for that matter).

is a major problem for Petitioner because, as noted below, Petitioner simply failed to confront (let alone satisfy) his burden to prove that as of the time of retention as determined by the Court, AM's country of habitual residence was still Mexico.

A. The Dearth of Evidence as to AM's country of habitual residence at the time of retention.

There is not much in the record bearing on the question of what AM's habitual residence was *as of February 8, 2020*. Respondent and Petitioner stipulated prior to trial that before October 1, 2018, AM's habitual residence was Mexico. But each party presented little evidence bearing on where AM's habitual residence was *after* October 2018 (hereinafter, "post-October habitual-residence evidence"). This is both surprising and important, for the reasons set forth in the following paragraphs, which detail how this came to pass and why it matters.

The Court begins by noting that Petitioner's shifting overarching theories of the case, as expressed before trial, were simply not geared towards addressing the issue on which he now needs to prevail: whether AM's country of habitual residence switched from Mexico to the United States by the time of the retention on February 9, 2019. Indeed, they were not geared towards establishing any date of wrongful removal, because they were quite expressly grounded on alleged wrongful removal rather than wrongful retention, or alleged wrongful removal with wrongful retention referenced only in a conclusory and undefined manner. First, as noted above, Petitioner's theory, as expressed to the Mexican Secretary of Exterior Affairs in Petitioner's application dated June 12, 2019, was that there was a wrongful *removal* on March 29, 2020. Second, the Petition filed in this case refers in conclusory fashion to both wrongful removal and wrongful retention, and seems to imply a wrongful removal date of sometime in October, but provides no information whatsoever as to how or when any wrongful retention occurred. (Doc. No. 1).

Next, in the initial case management order, Petitioner asserted *only* a claim of wrongful removal, stating that "[t]his case centers around the wrongful *removal* of a minor child, AM, from Mexico to the United States in *late October* 2018." (Doc. No. 10 at 2) (October 2018). This is problematic because it is entirely clear, under the undisputed facts as elicited at trial, that there was no wrongful removal.[41] But even if there had been a wrongful removal, it could not have been in *late* October 2018, and so Petitioner asserted a time of wrongful removal that turns out to have been wrong. Petitioner here still did not have a grasp of when any wrongful removal would have occurred.

Still less did Petitioner convey any inkling that there was a wrongful retention, let alone convey any understanding as to when any wrongful retention might have occurred. Moreover, in an inexplicable (and to this date unexplained) statement that ultimately was completely and undisputedly refuted by the evidence (including petitioner's own evidence), Petitioner stated "In October of 2018, Respondent, without the knowledge or consent of Petitioner, moved to the United States with AM." (*Id.*). And then, in the Joint Proposed Pretrial Order, Petitioner asserted, again,

---

[41] Perhaps Petitioner would seek refuge in the notion that the removal is properly deemed wrongful because, although the removal was done with his consent, Respondent gained that consent by misrepresenting her intentions. But this would be to no avail. As noted by one district court in this circuit:

> No legal authority supports the proposition that the removing parent's misrepresentation of her motivations voids the petitioning parent's initial consent to removal, and courts have declined to characterize similar situations as wrongful removal cases. *See, e.g.*, *Roche v. Hartz*, 783 F.Supp.2d 995, 1002 (N.D. Ohio 2011) (rejecting petitioner's contention that use of "misrepresentation to induce him into agreeing to the trip" constituted wrongful removal of the child); *McKie v. Jude*, 2011 WL 53058, at *6 (E.D. Ky. 2011) (declining to "recast" initial removal as wrongful "once Respondent exceeded the scope of [Petitioner's] consent to remain in the United States").

*Flores-Aldape,* 202 F. Supp. 3d at 801.

that "[t]his case centers around the wrongful removal of a minor child, AM, from Mexico to the United States in late October 2018." (Doc. No. 10 at 2). But then, for whatever reason, Petitioner asserted that there was a "wrongful removal and/or retention in October 2018[.]" (*Id.*). As noted, Petitioner here did identify a time of wrongful removal (albeit one that was proven to be wrong, as the evidence at trial undisputedly showed that the removal from Mexico was on October 1 (not "late October") of 2018 and that it wasn't wrongful). But as for wrongful retention, Petitioner claimed only that it was in "October 2018."

In other words, as trial approached, Petitioner had been all over the place (and yet also, conversely, nowhere in particular) as to his theory—as to whether it was wrongful retention, wrongful removal, or both, and as to when the wrongful retention and/or removal occurred. Given Petitioner's struggles in this regard, it is perhaps unsurprising that Petitioner was unprepared to show, in response to the Court's warning at trial that the period after October 2018 could be relevant, that AM's country of habitual residence remained Mexico months after October 2018.

At trial, there was a particular juncture at which the prospect of the admission of substantial post-October habitual-residence evidence arose essentially for the first and only time. But, alas, the prospects were never fulfilled.

Specifically, on direct examination of Silvia Marguerita Tooley, counsel for Respondent asked about day-care arrangements for AM upon his arrival in October 2018. Prior to Tooley's answer, counsel for Petitioner objected on the grounds of relevance because it had been stipulated that the habitual residence of the child at the relevant time was Delicias, Mexico. The Court promptly noted that Respondent probably differed with Petitioner as to what the relevant time period was, and then asked counsel for Respondent what he thought the relevant time period was for determining habitual residence. To that, counsel for Respondent noted that the stipulation

related only to the time of the removal from Mexico and that he did not know what Petitioner was alleging as the date the alleged wrongful retention began. To that, the Court suggested the possibility that a determination needed to be made as to when the (alleged) wrongful retention began and as to what AM's habitual residence was at that time, *i.e.*, whether it had changed from Mexico to the United States. And to that, counsel for Petitioner stated, repeatedly, in unequivocal position: that the wrongful retention occurred on October 17, 2018, the date that Petitioner believed the phone call to have taken place.[42]

After hearing out counsel, the Court responded by noting quite clearly that it had not yet decided when the wrongful retention, if any, began and that it therefore could not yet deem irrelevant testimony about the time period after late October 2018. Therefore, the Court clearly ruled that evidence for the post-October time period was conditionally relevant, with the condition being that the wrongful retention occurred after late October. The Court then made clear that it would allow counsel for Respondent to proceed accordingly. But surprisingly, counsel did not do so. Instead, he announced that he was declining to ask any more questions of Tooley. Moreover, as reflected elsewhere herein, he offered and elicited very little evidence supporting the notion that AM's residence switched from Delicias (Mexico) to Nashville (the United States). This was a questionable choice if such evidence were available, as such evidence could certainly help counter Petitioner's attempt to meet his burden of showing that AM's country of habitual residence had not changed from Mexico by the time (as ultimately determined by the Court) of the retention. In

---

[42] As discussed above, according to Petitioner's testimony, the phone call occurred on October 18, not October 17. However, for purposes of clarity and consistency, the Court will refer to Petitioner's asserted retention date as October 17 because that is in fact the date Petitioner asserts in his post-trial filings—even he evidently should have asserted October 18 based on his own testimony that the phone call to which he pegs his asserted date occurred on (Thursday) October 18.

his Response to Proposed Findings of Fact and Conclusions of Law of Petitioner, counsel for Respondent stated that he did not produce additional witnesses and choose not to continue the line of questioning because of the assertion of Petitioner's counsel that the date of wrongful retention was October 17, 2018. (Doc. No. 43 at 10). This was not wise, because even though *Respondent* refused to consider the possibility of a date of wrongful retention after October 2018, the Court very much had this possibility under consideration, and that is what matters. When a date of wrongful retention is not agreed upon by the parties, the Court will select the date of wrongful retention, if any. *See Vasquez v. Acevedo*, No. 3:18-CV-0137, 2018 WL 10374691, at *18 (M.D. Tenn. Apr. 16, 2018), *aff'd*, 931 F.3d 519 (6th Cir. 2019) (selecting a wrongful retention date when the parties did not agree).

The parties stipulated that AM's habitual place of residence was Mexico prior to October 2018, but that did not necessarily equate October 2018 as the date of wrongful retention. The Court was free to determine when the wrongful retention, if any, truly occurred, without being wedded to October 2018. In other words, merely because Respondent stubbornly took the unqualified position that the wrongful retention began in October 2018, the Court was not required to find that the wrongful retention either began in October 2018 or did not occur at all. Instead, the Court was free to determine itself based on the evidence when the wrongful retention, if any, began. The possibility always existed that the Court could find the date to be substantially later than October 2018, and it behooved each party to account for this possibility to maximize their chances of having the Court find the habitual-residence issue in its favor *no matter when* it found the wrongful retention, if any, to have begun.

But what is even more surprising, and more consequential, was Petitioner's reaction (or lack thereof) to this reality after being specifically advised of it at trial in the above-referenced

colloquy with the Court. Having been advised by the Court that the date of the wrongful retention (if any) remained to be determined, and that this date would be the relevant one for determining the place of habitual residence, Petitioner never presented any evidence to support the notion that AM's country of habitual residence remained Mexico not merely through October 17 (which seems indisputable), but also through a substantially later date. It is as if Petitioner was so confident in his position that the wrongful retention occurred by late October that he ignored the need to account for the very real possibility that the Court would identify a later date of retention. For Petitioner, the failure to introduce post-October habitual-residence evidence was quite detrimental because (as the Court has found) the retention began on February 9, 2019.

Even now, Petitioner for the most part limits his argument to the time frame from October 1 to October 17,[43] claiming that AM could not have switched his residence from Mexico to the United States in such a short period of time. (Doc. 40 at 26-29).[44] Petitioner does refer cursorily to the possibility of an alternative later date of wrongful retention:

---

[43] Respondent proposes that the Court find that "the fixed date of the alleged wrongful retention in this case is October 17, 2018." (Doc. No. 41 at 12-13). Respondent thus appears to suggest that Petitioner is, at this point, locked in to an alleged wrongful retention date of October 17, 2018, *i.e.*, that Petitioner cannot now assert a different wrongful retention date. If this is what Respondent is suggesting, the Court disagrees. Respondent makes the same implication elsewhere. (Doc. No. 43 at 10 ) ("Counsel for Mother discontinued his line of questioning *and* declined to call further witnesses who could testify to events in the minor child's life based upon the assertion of counsel that the Petitioner had chosen October 17, 2018, as his proposed date of wrongful retention."). Pending the Court's decision herein, such date (if any) had not been determined, and either party remained free to assert what date (or alternative dates) it saw fit based on the law and the evidence adduced at trial. So Petitioner was permitted to—and did (albeit inadequately, as noted herein)— assert (alternatively) a date of retention later than October 17, 2018.

[44] Petitioner cites to three Hague Convention cases wherein the children had lived in the United States for a longer period of time than had AM (as of the October 17 retention date). Plaintiff states that in *Robert*, the children lived in a new jurisdiction for 14 months, in *Panteleris*, the children lived in a new jurisdiction for over a year, and in *Ahmed*, the children lived in the new jurisdiction for two months. (Doc. No. 40 at 26-29). But these cases do not necessarily support his implied assertion that a short period of time equates to a lack of change of habitual residence. The cases

At trial, counsel for Respondent appeared to imply that the wrongful retention in this case may not have occurred until February 2020. Even if that were the case, the analysis is the same (with a four month period rather than a two-week period), as is the dearth of evidence regarding AM's activities in the United States, and the Court should still find that the relevant habitual residence is Mexico.

(Doc. No. 40 at 29 n.14). The Court grants Petitioner the point about the dearth (not to say total absence) of evidence regarding AM's activities in the United States; the fact that there is not much such evidence certainly makes it easier for Petitioner to meet his burden on this issue. But that is just the point: it is Petitioner's burden, and he did absolutely nothing to meet this burden. Far from introducing evidence tending to show that AM's place of habitual residence remained Mexico until February 2020 (for example, evidence of ties maintained or rekindled on the one trip back to Mexico, to note just one example of potential evidence of this kind), Petitioner insisted at trial that nothing about AM's activities after late October 2018 mattered at all on the issue of habitual residence.

---

place little (if any) emphasis on the length of time the children lived in the respective countries, and instead primarily emphasize the evidence regarding the ties the children had to each country. *Ahmed v. Ahmed*, No. 3:16-CV-142, 2016 WL 4691599, at *12 (E.D. Tenn. Sept. 7, 2016), *aff'd*, 867 F.3d 682 (6th Cir. 2017) (noting that Petitioner did not present enough evidence to meet the burden of showing that the United Kingdom was the children's habitual residence after seven to eight weeks living there, and instead evidence showed the trip was temporary); *Panteleris*, 601 F. App'x at 350 (noting that Petitioner showed by a preponderance of the evidence (including school, social engagements, meaningful connections to people and places, and locations of the children's belongings) that the habitual residence remained the children's place of birth after a trip of approximately one year to another country); *Robert*, 507 F.3d at 997 (6th Cir. 2007) (emphasizing attending kindergarten, vacationing, visiting family members, and participating in excursions in the United States, while in France the children were "ignored" by relatives, when determining the children's habitual residence had not changed during a three week visit to France). As has been discussed at length in other portions of this opinion, Petitioner failed to present evidence of AM's habitual residence during the relevant time period.

Petitioner's argument here is also undermined by the fact that the time period for AM to change his country of habitual residence extended, based on the Court's determination of the date of retention, well beyond October 17.

But as noted above, the relevant window actually is October 1, 2018 to February 8, 2019 (the day before the retention). Petitioner, who carries the burden to prove his prima facie case, unwisely failed to put any evidence into the record that AM's habitual residence after October 2018 continued to be Mexico. In this four-month-plus period, the record indicates, AM's habitual residence changed to the United States; at the very least, and more relevantly, it fails to show by a preponderance that his habitual residence did not change to the United States. Before leaving Mexico, AM attended several (at least one at school and multiple ones with family friends) "going away" parties for his upcoming departure to the United States. Considering AM's age, the Court finds it likely that these goodbye parties would have imbued AM with a sense that his upcoming move was more permanent than a vacation; although the record does not reflect any information about the messaging at these parties, as "going away" parties, it stands to reason that the messaging likely would have conveyed a sense of *permanent* location that even a five-year old would have gleaned. Notably, AM was withdrawn from school in Mexico and attended a going-away party at his school in Mexico. Respondent testified that this school party was a going-away party and that the school knew that the family was moving to the United States for more than a vacation. Additionally, AM was baptized (including a baptismal party which doubled as a goodbye party) before leaving Mexico. AM's baptism was another marker of permanence that even a young child could understand before moving to a new country. Both parents seem to have acted, before leaving Mexico, as though the move would be permanent,[45] and the Court has no reason to believe that

---

[45] Though Petitioner has alleged he believed this to be less than permanent, such as calling the trip a vacation on his filing with the Mexican Secretary of Exterior Affairs or alluding to how long he could stay in the United States under immigration laws, it was originally Petitioner's idea to move to the United States to live as a family unit. Though Respondent later broke off the relationship, the Court has no indication that AM, as a young child, would have understood the nuances of the plan to move.

AM thought differently. Though the Court has noted that its analysis does not turn on the intentions of AM's parents, these going-away parties and his baptism goodbye party would have indicated to AM that his stay in the United States was more permanent than a vacation or visit. *See Robert*, 507 F.3d at 997 (noting that parents "color[ing]" a child's attitude towards a particular location is consistent with the Sixth Circuit's approach of focusing on the child's experience).

AM's grandmother picked AM and Respondent up at the airport. Since moving to Tennessee, AM has been enrolled in day care since fall of 2018, lived in a stable home with his mother and grandmother, and participated in activities with his local family members. Some of his local family members include his grandmother, an Uncle (his mother's brother), AM's cousin(s),[46] a cousin of his grandmother, and other extended family. Tooley reports that these family members get together for social gatherings and activities frequently.

Petitioner has given the Court no reason to believe that AM viewed his stay in the United States as impermanent or as a vacation—other than his claim to the Mexican Secretary of Exterior Affairs implying AM was on vacation until late March (since discredited and in any event not probative of how *AM* views things)—that the stay in the United States was a "vacation." For example, he did not put on evidence that AM's trip back to Mexico over the holidays would have conveyed to him that it was a return to his habitual residence, *i.e.*, that in being then present in Mexico, his "presence ha[d] a degree of settled purpose from [AM's] perspective." *Robert*, 507 F.3d at 993. In fact, Respondent testified (credibly and undisputedly) that she told AM that the trip to Mexico over the holidays was just a visit to see his father, not a trip back home. Additionally, the tickets for the trip were round trip tickets. Though the Court does not look at Respondent's

---

[46] It is unclear from Tooley's testimony how many grandchildren other than AM she has, and where those grandchildren reside.

intent, this would have colored AM's view of both the return trip to Mexico and his time in the United States. *Id.* at 996. Notably, Respondent testified (credibly and undisputedly)[47] that AM was concerned that Santa would not know where to find him during the holiday trip; this tends to suggest that AM considered the United States, not Mexico, to be his home that Santa would know to visit. AM's statement is rather probative here,[48] because '[t]he place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Monasky*, 140 S. Ct. at 726.

Thus, Respondent has put on at least some evidence that AM had a "degree of settled purpose" in the United States after October 2018. *See Robert*, 507 F.3d at 993. This evidence may be underwhelming, but it is enough, especially since Petitioner bears the burden as to change in habitual residence and did little to nothing to meet it. Therefore, the Court finds that AM's country of habitual residence at the time of his retention—February 9, 2019—was not shown by Petitioner to be other than the United States. And thus Petitioner fails to meet his burden of showing wrongful retention. *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 271 (3d Cir. 2007) ("[I]f we hold that the United States was [the child's] habitual residence [on the date of retention] . . . her retention in the United States would not be wrongful[.]")

The Court realizes that the present case is like *Karkkainen*:

> There are also factors that weigh against a finding of acclimatization. "Habitual residence may only be altered by a change in geography and passage of time," and is a concept that focuses on past experience, not future intentions, *Friedrich v. Friedrich*, 983 F.2d 1396, 1401 (6th Cir.1993). It is fair to ask whether

---

[47] The Court finds this testimony credible based on the manner in which Respondent delivered it, the fact that it was not impeached in any way, and the fact that the Court deems it fairly unlikely that Respondent would have thought to invent this particular alleged statement by AM.

[48] The Court is not being flip in acknowledging that a child's statement about Santa Claus typically may not be relevant to the issues in a federal case, but in this case it actually is.

> [the child] was physically present in the United States for an amount of time sufficient to provide the experiences required to acclimatize to a new country.

445 F.3d at 294. In the present case, the factors (or actually, factor, singular) that weighs against a finding of acclimatization is the relative lack of time AM had been in the United States by the time of retention. But depending on the circumstances, roughly four months can be enough for acclimatization; indeed, given the circumstances in *Karkkainen*, the Court found less than three months sufficient. And the present case is unique in that it involves a petitioner who left the record utterly devoid of evidence suggesting that, by the time of the retention as determined by the Court (February 9, 20120), the child had not left behind the prior country of habitual residence and/or that the child did not acclimatize to the new country. Instead, Petitioner here relied on his unshakeable conviction that a wrongful retention occurred prior to the end of October 2018, leaving him with nothing to rely on to meet his burden besides the relatively short passage of time between October 2018 and February 2019. This proved to be insufficient, especially given the existence of some evidence suggesting that AM achieved an adequate degree of settled purpose in the United States. Thus, Petitioner failed to establish, as required, that the country of habitual residence at the pertinent time was not the United States.

No further analysis is required for the Court to conclude that Petitioner has failed to meet his burden of showing that AM was wrongfully retained.[49] *Tsai-Yi Yang*, 499 F.3d at 271 ("[I]f we hold that the United States was [the child's] habitual residence [on the date of retention], the analysis is complete as the Hague Convention would not apply because her retention in the United States would not be wrongful as defined by Article 3."); *Selo*, 929 F. Supp. 2d at 726 ("A petitioner

---

[49] This means, among other things, that the Court need not resolve various issues that conceivably could have been relevant to this issue, including the substance of relevant Mexican (Chihauhuan) law.

cannot claim that a retention of a child is 'wrongful' under the Hague Convention unless the child to whom the petitioner relates was [at the time of retention] 'habitually resident' in a State signatory to the Convention and was retained in a different state."). And that means that Petitioner must be denied relief. *Moreno v. Zank*, 895 F.3d 917, 923 (6th Cir. 2018) ("If . . . [the child] was a habitual resident of Michigan [at the time of retention], then [the petitioner] could get no relief under the Convention, and that is the end of the case[.]"); *Miller*, 2018 WL 4008779, at *16 ("In sum, [Petitioner] fails to prove that Canada was the children's country of habitual residence at the time of their retention in Chattanooga, and the Court's analysis must therefore end here.").

## CONCLUSION

The Court means not to be critical, but rather only to explain its decision. The reality is that this case was marred by questionable assumptions and tactical decisions by each party that rendered identification of the parties' positions difficult, and the identification of the path for resolution of the case likewise difficult. As it turned out, the resolution of this case ultimately turned on burdens—namely, who bears what burden(s) on the issue of the country of habitual residence, who tried to meet such burden(s), and who failed or succeeded to meet its burden(s). Petitioner bore the burden and failed to carry it.

For the above-mentioned reasons, the Court will **DENY** the Petition.

An appropriate order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE